## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SIYING LIU**, *et al.*,

                Applicants,

                v.

**ALEJANDRO MAYORKAS**, *in his official capacity as Secretary of Homeland Security, et al.*,

                Defendants,

                and

**ITSERVE ALLIANCE, INC.,** *et al.*,

                Intervenor-Defendants.

Case No. 1:21-cv-01725 (TNM)

## MEMORANDUM OPINION

The H-1B visa program allows U.S. employers to hire foreign nationals into so-called specialty occupations. Employers compete fiercely for these visas. Over the years, the Department of Homeland Security (DHS) and the U.S. Citizenship and Immigration Services (USCIS) have revised their method for processing H-1B visas to make it fairer and more efficient. One of those changes is at issue here.

Before 2019, employers wishing to bring an alien into the country on an H-1B visa filed a paper petition with USCIS. Because the number of petitions always outstripped available visas, USCIS conducted a lottery to choose which petitions to process. Handling all the paper petitions was resource-intensive, so USCIS overhauled the system in 2019. Under the new rules, employers first file an electronic registration with USCIS. USCIS conducts its lottery using the

registrations.  Every selected registration entitles an employer to file a petition on behalf of the alien named in the registration.

Plaintiffs (the Applicants) are several hundred foreign nationals whom USCIS did not select in any of the H-1B lotteries it conducted this fiscal year.  They allege the new rules make it easier to game the H-1B visa system.  Because registrations are cheap and do not take long to file, they say that "H-1B consultancies" offer to file fake registrations for a fee.  A foreign national with multiple employers—real or imagined—filing on his behalf stands a much better chance of having USCIS select at least one of his registrations.  If USCIS selects a registration filed by one of the consultancies, the alien can file a form to change his employer.  The upshot, according to the Applicants, is that fraudsters are winning H-1B visas at the expense of rule followers like themselves.  The Applicants contend that DHS and USCIS's (the Department) new rules violate the Administrative Procedure Act (APA) and are ultra vires because they contradict relevant statutes.  They also argue that the new rules are arbitrary and capricious.

The Department argues that the Applicants lack standing.  Both the Department and Intervenor-Defendants ITServe Alliance, Inc., iTech U.S., Inc., NAM Info Inc., and Lucid Technologies, Inc. (collectively, the Alliance) argue that the Department can establish the registration system.  They also argue that the Department adequately responded to public comments and provided a reasoned explanation in support of the new rules.

The Court finds that Applicants have standing but that the new rules are not ultra vires because they do not conflict with the relevant statute.  Nor are they arbitrary and capricious because the Department met its burden in responding to public comments.  The Court will therefore deny the Applicant's motion for summary judgment, will grant the Alliance's cross-

motion for summary judgment, and will largely grant the Department's cross-motion for summary judgment.

## I.

Some background on the H-1B visa program illuminates the parties' arguments. Congress created the program in the Immigration Nationality Act (INA), 8 U.S.C. § 1101, *et seq.* H-1B visas allow companies to temporarily employ foreign workers in specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b).  The INA defines a specialty occupation as one that requires "theoretical and practical application of a body of highly specialized knowledge." *Id.* § 1184(i)(1)(A).  The position must demand a bachelor's degree or higher. *Id.* § 1184(i)(1)(B). A prospective employer has the responsibility to file on behalf of the alien it wants to hire. *Id.* § 1184(c)(1).  With some exceptions, USCIS may grant 65,000 H-1B visa petitions and 20,000 "cap exempt" H-1B petitions every fiscal year. *Id.* § 1184(g).

The annual filing period for H-1B visas begins April 1.  Reg. Req. for Petits., 84 Fed. Reg. 888, 924 (Jan. 31, 2019).  Every year since 2014, USCIS has received enough H-1B visa petitions to meet the annual cap within the first week of the filing period.  Defs.' Cross-Mot. for Summ. J. and Opp'n (Defs.' Mem.) at 19, ECF No. 41[1]; *see also* 84 Fed. Reg. at 925.  Because companies sent their petitions by mail, USCIS staff faced a tremendous strain before 2019, processing tens of thousands of petitions per day.  *See* 84 Fed. Reg. at 925 ("In FY 2017, USCIS received 198,460 H-1B petitions in the first five days that cap-subject petitions could be filed(.)"), at 923 ("Each year . . . USCIS expends resources towards opening and sorting mail, identifying properly filed petitions, and removing duplicate petitions before proceeding with the petition selection process . . . these duties present operational challenges for USCIS, including

---

[1]  All page numbers refer to the pagination generated by the Court's CM/ECF filing system.

greater labor needs and limited space at Service Centers where petitions are stored, sorted, and selected."). Returned applications for unsuccessful applicants involved more hassle and costs. Defs.' Mem. at 20–21.

In 2019, USCIS addressed these inefficiencies by promulgating a new rule (the Registration Rule, or Rule). The Rule requires prospective employers to register on USCIS's website and submit an electronic registration on behalf of each employee it seeks to hire under the H-1B program. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). USCIS then conducts the lottery using the registrations. *See id.*; *see also id.* § 214.2(h)(8)(iii)(A)(3)–(6). When it projects that it has selected enough registrations to meet the annual H-1B cap, USCIS notifies the companies whose registrations it selected that they may file petitions on behalf of their alien employees. *Id.* § 214.2(h)(8)(iii)(A)(1); *see also id.* § 214.2(h)(8)(iii)(D).

USCIS ran the first lottery of the current fiscal year in March 2021. *See* USCIS, *USCIS Conducts Second Random Selection from Previously Submitted FY 2022 H-1B Cap Registrations* (last updated July 29, 2021).[2] Using "historical data related to approvals, denials, [and] revocations," USCIS chose the number of registrations it projected would provide sufficient numbers to meet the H-1B cap. *Id.* But USCIS later determined it had not selected enough registrations, so it conducted a second lottery. *Id.* When the number of registrations selected in the second lottery still proved insufficient, USCIS conducted a third lottery. *See* USCIS, *USCIS Conducts Third Random Selection from Previously Submitted FY 2022 H-1B Cap Registrations* (last updated Nov. 19, 2021).[3]

---

[2] *Available at* https://www.uscis.gov/news/alerts/uscis-conducts-second-random-selection-from-previously-submitted-fy-2022-h-1b-cap-registrations.

[3] *Available at* https://www.uscis.gov/newsroom/alerts/uscis-conducts-third-random-selection-from-previously-submitted-fy-2022-h-1b-cap-registrations.

The Applicants contend that USCIS needed three lotteries because its Registration Rule ignored the possibility of fraud.  *See* Pls.' Mot. for Summ. J. (Pls.' Mem.) at 13–14, ECF No. 33-1.  By lowering the bar for law-abiding applicants, they say, USCIS also lowered the bar for fraudsters.  No longer must an applicant submit a paper petition and pay the full filing fee to play in the lottery.  *Id.* at 16–17.  A $10 registration fee is all one needs.  *Id.* at 12.  Thus, H-1B "consultancies" offer to file registrations on behalf of foreign nationals, dramatically boosting that alien's chance of getting selected in the lottery.  *Id.* at 16.  Staffing companies practice a related scam, say the Applicants, by engaging in a "bench and switch" scheme:

> [C]ompanies, who purport to be staffing companies, file H-1B petitions using fake jobs, thereby creating a "bench" full of H-1B visa workers ready to "switch" to another employer at any time.  When these workers were selected for, and ultimately received, an H-1B visa, they simply did not work until the company (or even the employees themselves) could find an open position with a third-party employer.  The third-party employer would then file an H-1B change of employer petition with USCIS on behalf of the employee under 8 C.F.R. § 214.2(h)(2)(i)(D), which allows H-1B visa holders to change employers.

Pls.' Mem. at 17.  Without these fraudulent practices, the Applicants allege that USCIS would have selected at least some of them in this year's multiple lotteries.  *Id.* at 8–9.

This case has a long procedural history.  Shortly after filing their Second Amended Complaint (Compl.), *see* ECF No. 11, the Applicants filed a preliminary injunction, *see* Mot. for Prelim. Injunction, ECF No. 15.  The Applicants also filed a temporary restraining order, *see* Mot. for Temp. Rest. Order, ECF No. 16, which the Court denied in a hearing, *see* Aug 2, 2021, Min. Entry.  The Applicants then withdrew their motion for preliminary injunction.  *See* Not. of Withdrawal of Mot., ECF No. 19.  Next, the Department moved to dismiss, *see* Mot. to Dismiss, ECF No. 21, but the Court denied that motion, *see* Mem. Order, ECF No. 26.  At summary judgment, the Department is joined by the Alliance, which claims its member companies

experience significant cost savings under the Registration Rule. *See* Intervenor-Defs.' Cross-Mot. for Summ. J. (All. Mem.) at 19, ECF No. 40-1. The summary judgment motions are now ripe.[4]

## II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). This means that "[t]he entire case on review is a question of law." *Id.* (cleaned up).

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also provides that a reviewing court must set aside agency action if the agency has acted "without observance of procedure required by law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* §§ 706(2)(D), (C).[5]

---

[4] Because the Applicants challenge a federal law, the Court possesses federal question jurisdiction over this case. *See* 28 U.S.C. § 1331.

[5] In APA cases, a reviewing court "should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). The Applicants submitted several exhibits with their motion for summary judgment that were not before the Department when it drafted the Registration Rule. *See* ECF Nos. 33-2, 3, 4, and 5. These include statistical analyses created by the Applicants themselves as well as screenshots of emails and webpages. *See id.* The Department argues that the Court should strike these extra-record submissions. *See* Defs.' Mem. at 36–39. In their Reply, the Applicants do not respond to the Department's arguments. *See* Pls.' Reply in Supp. of Pls.' Mot. for Summ. J. and Opp'n, ECF No. 46; *see also Wilson v. DNC Servs. Corp.*, 315 F. Supp. 3d 392, 398 (D.D.C. 2018), *aff'd,* 831 F. App'x 513 (D.C. Cir. 2020) (per curiam). The Court therefore strikes these submissions and does not rely on them.

### III.

The Court first addresses the Department's argument that the Applicants lack standing. To establish standing, the Applicants must allege: (1) that they have suffered an injury in fact that is both concrete and particularized and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the Department; and (3) that a favorable decision is likely to redress the identified harm. *See Sabre, Inc. v. DOT*, 429 F.3d 1113, 1117 (D.C. Cir. 2005).

The Court found that Applicants possessed standing at the motion to dismiss stage. *See* Mem. Order at 2–5, ECF No. 26. But plaintiffs must establish standing at the start of *each phase* of litigation. *See Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019). "[A] court's determination that a plaintiff has established standing at the motion to dismiss stage . . . does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment." *Scenic Am., Inc. v. U.S. DOT*, 836 F.3d 42, 48 (D.C. Cir. 2016) (emphasis in original). So "[a] plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." *Osborn v. Visa, Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015). At the summary judgment stage, "[i]f . . . the court determines that the plaintiff has not introduced sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing, the court has no power to proceed and must dismiss the case." *Scenic Am., Inc.*, 836 F.3d at 48–49.

*First*, the Department argues Applicants have not proven that any of them risk imminent injury. *See* Defs.' Mem. at 31–34. Recall that the injury alleged is the reduced likelihood of selection in the lottery for law-abiding foreign nationals. Reply in Supp. of Pls.' Mot. (Pls.' Reply) at 8, ECF No. 46. The Applicants argue that their odds of selection decreased from 45% to 28% because of the Registration Rule. Compl. ¶ 63. The Department responds that this only

matters if the Applicants' prospective employers still want to hire them and plan to file a petition on behalf of any Applicant selected in a future lottery.  The Department points out that only one prospective employer, CreditNinja Lending, LLC, provides a statement at summary judgment claiming that it still wants to hire one of the Applicants—Jiaqi Xu.  Defs.' Mem. at 32; *see also* Renewed Decl. of KMD Partners (CreditNinja Decl.), ECF No. 33-6.[6]  The Department asks the Court to dismiss the claims of the approximately four hundred other Applicants whose prospective employers did not submit declarations.  *See* Defs.' Mem. at 32.  The Court declines to do so, because if one plaintiff can show standing, the Court "need not consider the standing of the other plaintiffs" who raise the same claims.  *Mtn. States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

The Applicants' standing thus rises or falls with the fate of Xu.  The Department says the Court should disregard CreditNinja's statement because it has many problems.  Defs.' Mem. at 32.  First, CreditNinja titled its statement an "[a]ffidavit," but an "affidavit" is a "voluntary declaration of facts written down and *sworn to by a declarant before an officer authorized to administer oaths*."  *Id.* (quoting "Affidavit," *Black's Law Dictionary* (11th ed. 2019)).  Because the statement does not list any officer authorized to administer oaths—and because Federal Rule of Evidence 901(a) says that a party may not submit something that is not what it purports to be—the Court should reject CreditNinja's statement.  *Id.* at 32.  Even if the Court does consider the statement, the Department says a line-by-line comparison of this statement and a statement submitted six months ago shows that, but for the date and registration number, they are identical.  *Id.* at 32–33.  Because CreditNinja "could not even be bothered" to update the statement, the

---

[6] At the motion to dismiss stage, CreditNinja was known as KMD Partners, LLC.  *See* CreditNinja Decl. at 2; Aff. of KMD Partners, LLC, ECF No. 22-1.

Department wants the Court to reject it. *Id.* at 33. And finally, the Department argues that the statement shows Xu's claim is moot because the "operative language" confirms the statement is not discussing the current fiscal year. *Id.* And even if it is, the Department argues the language is speculative because Xu has no way of knowing whether USCIS will conduct another lottery this year. *Id.* at 33–34 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412–413 (2013)).

The Court disagrees. Take first the Department's argument that the Court should reject CreditNinja's statement because it lacks the signature of an officer authorized to swear oaths. *See id.* at 32. The Department correctly points out that Federal Rule of Evidence 901(a) says that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." But that is not dispositive here because it is not clear that Applicants intended CreditNinja's statement to be treated like an affidavit. Applicants styled the exhibit containing the statement as a "renewed declaration." *See* CreditNinja Decl. at 1. The Court may consider declarations at the summary judgment stage. Fed. R. Civ. P. 56(c). It will not exalt form over substance and disregard CreditNinja's statement just because the Applicants incorrectly call it an affidavit.

Next consider the Department's argument that CreditNinja's statement is likely unreliable because the company "could not even be bothered" to update it. *See* Defs.' Mem. at 33. The best explanation for the similarities between this statement and the previous statement, *see* Aff. of KMD Partners, LLC, ECF No. 22-1, is that CreditNinja still wants to hire Xu. Indeed, CreditNinja's new statement suggests as much because it says that "[s]hould an H-1B visa become available this fiscal year, we intend to file an H-1B petition for Jiaqi Xu." CreditNinja Decl. at 2. Because CreditNinja still wants to hire Xu, there is no reason for it to

update the statement beyond changing the date and registration number.  Thus, the Court will not disregard CreditNinja's new statement.[7]

Consider finally the Department's claim that CreditNinja's statement shows Xu's claim is moot.  The Department correctly points out the irrelevance of allegations in the statement about what CreditNinja *would* have done *if* USCIS had selected Xu in the previous lotteries.  *See* Defs.' Mem at 33; *see also* CreditNinja Decl. at 2.  Statements about the past do not matter when a plaintiff seeks prospective relief.  *See* Pls.' Mem. at 9 (requesting that the Court "enjoin [the Registration Rule's] use in future lotteries"); *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) ("In a case . . . where the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing.  Rather, [the plaintiff] must show he is suffering an ongoing injury or faces an immediate threat of injury.").  But CreditNinja also claims it will submit a petition for Xu if USCIS selects him in another lottery run this year.  *See* CreditNinja Decl. at 2.  The Department wants a more definitive statement of intent than this, *see* Defs.' Mem. at 33–34, but it is hard to imagine how CreditNinja could state its plans any more clearly.  The Court thus finds the CreditNinja statement sufficient and will rely on it.

The CreditNinja statement does not end the Court's inquiry into the imminence of injury because Applicants cannot prove USCIS will run another lottery.  And without another lottery, CreditNinja's future intentions make no difference.  *See Dearth*, 641 F.3d at 501.  More, the Department claims there will be no more lotteries this fiscal year.  *See* Decl. of John M. Allen (Allen Decl.) ¶ 5, ECF No. 24-1 ("USCIS expects that the third random selection and subsequent

---

[7]  The Department cites *Humane Society of the United States v. Vilsack*, 935 F.3d 598 (D.C. Cir. 2015) for the proposition that "courts cannot presume the missing facts necessary to establish an element of standing."  *Id.* at 603; *see* Defs.' Mem. at 34–36.  But the Department's comparison turns on the lack of "adequate attestations" in this case.  *See* Defs.' Mem. at 34.  Because the CreditCheck statement is adequate, the comparison is inapt.

filing period will generate sufficient petition filings to reach the FY 2022 numerical allocations(.)").

But the Department has been mistaken about this before.  It failed to select the correct number of filings in the initial lottery.  *Id.* ¶¶ 3–5.  After running a secondary lottery, the Department claimed they had selected enough registrations to use up all the H-1B visa slots.  *See* Decl. of Connie L. Nolan ¶ 3, ECF No. 23-1.  Yet they were wrong again, so they ran the third lottery.  Allen Decl. ¶ 5.  USCIS has not published data on how many registrations selected in the last lottery led to petition filings and approvals.  Pls.' Mem. at 14.  Nor have they announced that they have selected all the registrations needed to meet this year's H-1B cap, even though the petition filing period for the third lottery has closed.  *See* USCIS, *H-1B Electronic Registration Process* (last updated Feb. 23, 2022).[8]

Considering the Department's poor record in predicting future lotteries, the Court credits the Applicants' allegation that USCIS will likely conduct a fourth lottery.[9]  *See* Pls.' Not. of Supp. Info., ECF No. 55.  The Applicants base this allegation on the high number of registrations submitted this fiscal year—a 12% increase over the prior year—and the number of denials USCIS has issued thus far.  *See* Pls.' Mem. at 13–14.  This is thin evidence at the summary

---

[8]  *Available at* https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.

[9]  Earlier today the Department announced it had received enough petitions to meet the H-1B cap.  *See* Defs.' Resp. to Pls.' Notice at 1, ECF No. 57.  Even crediting that claim, this does not change the standing analysis because the CreditNinja statement says CreditNinja will file an H-1B petition for Xu if a visa becomes available "this fiscal year."  CreditNinja Decl. at 2.  True, to file a petition for Xu CreditNinja would have to file a new registration in the 2023 fiscal year lottery, which opened today.  *See* USCIS, *FY 2023 H-1B Cap Initial Registration Period Opens on March 1*, https://www.uscis.gov/newsroom/alerts/fy-2023-h-1b-cap-initial-registration-period-opens-on-march-1 (last updated Jan. 28, 2022).  But companies that file in this lottery will be notified long before the fiscal year expires.  *See id.*  Thus, the Court finds it likely CreditNinja will file a new registration on Xu's behalf.

judgment stage.  *See Scenic Am., Inc.*, 836 F.3d at 48–49.  And if the Department had not

repeatedly selected too few registrations, the Applicants would be in trouble.  But considering all

the available evidence, the Court finds the dispute is not moot.  The Applicants show an

imminent injury.

> *Second*, the Department argues—briefly—that the Applicants fail to prove causation.  *See*

Defs.' Mem. at 31, 34.  The Department contends that where "standing depends 'on the

independent actions of third parties' (Applicants' potential employers as sponsoring registrants),

the Applicants may not just ask the Court to assume a chain of causation."  *Id.* at 31 (quoting

*New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002)).  The Department also

claims that "the near complete absence of explaining the causative chain (for hundreds of

Plaintiffs) falls well short of establishing any element of standing at summary judgment."  *Id.* at

34.

> In both cases, the Departments' statements refer to the lack of employer declarations for

any of the Applicants other than Xu.  But as the Court already explained, if one Plaintiff has

standing, the other Applicants do, too.  *See Mtn. States Legal Found.*, 92 F.3d at 1232.  The other

Applicants need not show causation provided Xu can.  The Department argues the "conditional"

language in the CreditNinja declaration is too speculative to show causation for Xu.  *See* Defs.'

Mem. at 33–34.  But the CreditNinja declaration states that if USCIS selects Xu's registration, it

will file a petition on his behalf.  *See* CreditNinja Decl. at 2.  Under the circumstances, that is as

clear as CreditNinja can get.

> The Department does not press its causation argument further, but it is worth reviewing

why the Court found causation at the motion to dismiss stage.  The Court observed that "the

Applicants have provided substantial evidence: their odds of selection dropped from 45% to 28%

because of the Registration Rule. That constitutes 'substantial evidence of a causal relationship.'" Mem. Order at 4–5 (quoting *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015)). The Department does not challenge those figures at summary judgment. So the Court finds now, as it did when considering the Department's motion to dismiss, that these figures show substantial evidence of a causal relationship.

*Third*, the Department does not contest that a change in the Registration Rule would redress the Applicants' injury. The Court finds that because the Registration Rule decreased the odds of selection, rescinding the Registration Rule would increase the Applicants' odds of selection. The Applicants have therefore shown redressability.

The Court finds the Applicants have standing to challenge the Registration Rule.

## IV.

## A.

On the merits, the Applicants' first argue that the Registration Rule violates the APA and is ultra vires because it contradicts the INA. *See* Pls.' Mem. at 22–30. To assess this argument, the Court must turn to the *Chevron* framework, which governs a court's review of an agency's interpretation of a statute. *See Chevron, U.S.A, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). A court first asks whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.

If the statute is silent or ambiguous, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. At this second step of the *Chevron* framework, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction

13

of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

For their *Chevron* arguments, the Applicants rely on the following statutory provisions:

- "The total number of *aliens* who may be issued visas or otherwise provided nonimmigrant status during any fiscal year . . . may not exceed . . . 65,000(.)" 8 U.S.C. § 1184(g)(1) (emphasis added).

- "*Aliens* who are subject to the numerical limitations of paragraph (1) shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status." *Id.* § 1184(g)(3) (emphasis added).

- "Where multiple petitions are approved for 1 *alien*, that *alien* shall be counted only once." *Id.* § 1184(g)(7) (cleaned up).

Begin with *Chevron* step one.  The Applicants argue that the INA unambiguously allocates visas by alien.  *See* Pls.' Mem. at 23.  The problem with the Registration Rule, they say, is that it allocates visas by registration.  The Rule ignores that the INA "forecloses the possibility that Defendants can create an H-1B selection process that prioritizes registrations and allows for multiple registrations for one individual." *Id.* at 24.  Because the statute is clear, and because the Registration Rule violates the statute, the Applicants contend the Court's review need not move to *Chevron* step two.  *Id.* at 25.

The Court agrees that the INA directs DHS to allocate H-1B visas by alien.  So the statute is unambiguous about this specific issue.  But the Applicants' characterization of the conflict between the INA and the Registration Rule depends on a conflation of "alien" with "registration."  None of the provisions highlighted by the Applicants uses the word

"registration."[10]  Instead, the INA (1) places a cap on the number of H-1B visas that USCIS can issue (§ 1184(g)(1)), (2) requires that USCIS issue aliens visas in the order in which petitions are filed (§ 1184(g)(3)), and (3) instructs that if USICS approves multiple petitions for an alien, USCIS may count that alien only once for purposes of the cap (§ 1184(g)(7)).

The Registration Rule aligns with each of these requirements.  The Rule does not allow more than 65,000 visas (85,000 with the exempt visas included), so it complies with § 1184(g)(1).  The Applicants do not argue that the Rule allows USCIS to issue visas in any order other than the order in which it receives petitions.  Nor could they, because all the Registration Rule does is require prospective employers to file a registration as a first step in the process.  A registration is not a petition.  The Registration Rule is "simply an antecedent procedural step to be eligible to file an H-1B cap petition." Defs.' Mem. at 45; *see also* Defs.' Mem. at 21–22 (describing the effect of the Registration Rule).  So the Rule does not violate § 1184(g)(3).  And the Rule does not violate § 1184(g)(7) because it makes no provision for USCIS to count an alien more than once against the H-1B cap.

True, more than one prospective employer may file a registration on behalf of a foreign national.  But § 1184(g)(7)'s reference to "multiple petitions" already allows multiple employers to file *petitions* on behalf of the same alien.  Indeed, in response to public comments, USCIS has

---

[10]  The INA's silence about registrations arguably raises a *Chevron* step two question.  But the Applicants do not challenge the Department's authority to require a registration-based lottery. *See* Pls.' Mem. at 27 ("Plaintiffs do not challenge the fact that there is a registration-based lottery.  In fact, such a process makes sense, is inherently reasonable, and saves the agency and employers time and money.").  What the Applicant's challenge is *this particular* registration-based lottery.  *Id.*  Hedging their bets in case the Court finds the statute ambiguous, the Applicants make several arguments about *Chevron* step two.  *See id.* at 25–30.  But the Court does not find the statute ambiguous as to the specific question raised by the Applicants, so it need not consider their step two arguments.  In any event, these arguments are substantially the same as the Applicants' argument that the Registration Rule is arbitrary and capricious.  *See id.* at 30–40.  The Court considers and rejects these arguments in Section IV.B.

long recognized that multiple petitions might exist for a single foreign national. *See, e.g.*, 84 Fed. Reg. at 905 ("USCIS notes that there is no prohibition on a prospective H-1B beneficiary considering job opportunities with multiple employers which may seek to extend a job offer."), at 905–06 ("The regulations do not currently restrict multiple unrelated employers from petitioning the same beneficiary or beneficiaries, and DHS does not intend to impose such a limitation in the registration process in this final rule."); Petits. Filed on Behalf of H-1B Temp. Workers, 73 Fed. Reg. 15,389, 15,392 (Mar. 24, 2008) (similar). And the Applicants admit the INA allows this. *See* Pls.' Mem. at 15.

Consider also that if an alien could have only one employer file a registration on his behalf, that would conflict with § 1184(g)(7). Such a rule would effectively bar any scenario where an alien could have more than one petition approved for him. Section 1184(g)(7) would become meaningless. That is why the Registration Rule allows for multiple registrations. And it adheres to the INA, because "one alien, one registration" is not in the statutory language. What matters is that USCIS only issued one visa to each alien before the Registration Rule, and it only issues one visa to each alien now.[11]

Because the INA is clear, the Court need not move to *Chevron* step two. And because the Registration Rule does not violate the INA, it is not ultra vires.

---

[11] In some of their briefing, the Applicants acknowledge multiple *registrations* are permitted under the INA. *See, e.g.,* Pls.' Mem. at 15 ("Plaintiffs do not take issue with multiple bona fide registrations from different legitimate employers, as this has occurred in the H-1B program for three decades with no issue."). But the Applicants still want any registration-based lottery to be run by alien, not by registration. *See id.* This, too, would violate § 1184(g)(7), because only the company that filed the registration could file a petition for the alien.

**B.**

The Court turns next to the Applicants' argument that the Registration Rule is arbitrary and capricious. *See* Pls.' Mem. at 30–40. An action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). The Applicants contend the Registration Rule is arbitrary and capricious for three reasons.

*First*, the Applicants argue that the Department failed to examine and meaningfully respond to public comments. Pls.' Mem. at 30. The Applicants say that under the APA, "an agency must consider and respond to significant comments received during the period for public comment." *Id.* at 31 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (cleaned up)). USCIS received 817 comments during the notice and comment period. *Id.* One hundred and twenty-two of these discussed the likelihood of fraud and abuse. *Id.* As an example, the Small Business Administration warned that companies would try to "flood" or "dilute" the registration pool, "making it more difficult for small businesses to obtain an essential H-1B slot and worker." *Id.* at 32 (cleaned up).

Rather than provide meaningful responses, the Applicants say the Department "glossed over many of the obvious and simple safeguards which would have curtailed the abuse that is occurring now." *Id.* at 31. They contend the Department "only offered a bare bones denial of the concerns raised and expressed confidence that the cap registration rules, as promulgated, are sufficient to curtail any potential abuses." *Id.* at 34. Because the Department did not adequately

respond to these comments, the Applicants contend the Department failed to "demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant." *Id.* at 36 (quoting *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998)).

The Applicants set the bar too high. "[I]t is settled that the agency is not required to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking. . . . Instead, the agency's response to public comments need only enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993). The Department met that bar here. It devoted multiple pages to responding to potential fraud perpetrated by prospective employers. *See* 84 Fed. Reg. at 904–08. The Department said that "USCIS intends to check the system for duplicate registrations during the registration phase similarly to how USCIS currently checks for duplicate H-1B petition filings." *Id.* at 900. They also said that "[d]uring the course of an H-1B petition adjudication, USCIS will review the beneficiary's qualifications" and will refer evidence of fraud to the "USCIS Fraud Detection and National Security Directorate." *Id.* at 908. Based on the Department's assessment, the final rule "authorize[d] USCIS to collect sufficient information for each registration to mitigate the risk of fraud and abuse." *Id.* at 904. This is far from a "bare bones denial of the concerns raised" by the commenters. Pls.' Mem. at 34.

*Second*, the Applicants argue that the Department ignored matters of importance under the statute. *Id.* at 37 (citing *Gresham v. Azar*, 950 F.3d 93, 102 (D.C. Cir. 2020)). The Applicants argue that because the INA contemplates granting visas based on aliens and not registrations, the Registration Rule violates the INA. They also cite two parts of the INA

designed to deter fraud and contrast them with the Registration Rule, which they say invites fraud. *Id.* at 38. They contend this comparison shows the Rule is "contrary to the intent of Congress." *Id.* at 39.

Start with the Applicant's claim that the Registration Rule flouts Congress's intent. The two sections the Applicants cite require that an employer pay a penalty for ending an alien's employment before the agreed-upon date and prohibit an employer from requiring an alien to pay for the H-1B petition. *See* 8 U.S.C. §§ 1182(n)(2)(C)(vi)(I) and (II). Neither of these have anything to do with the Registration Rule. As for the Applicant's other arguments, they are merely repackage versions of arguments the Court has already rejected. Recall that the Court found that the Registration Rule does not violate the INA. And in reviewing the Applicant's argument that the Department failed to appropriately address comments about fraud, the Court found the Department had met its burden. It need not reconsider those arguments here.

*Third*, the Applicants argue that the Department failed to articulate a satisfactory explanation for its actions. *Id.* at 39 (citing *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84 (D.C. Cir. 2020) (holding that there must be a "rational connection between the facts found and the choices made") (cleaned up)). The Applicants argue that the Department ignored empirical evidence and data suggesting that the Registration Rule would lead to fraud and abuse. *Id.* The Applicants reprise their argument that commenters warned the Department that the Registration Rule would invite fraud. *Id.* And they contend that failing to remove fraudulent registrations has led directly to the need to hold multiple lotteries. *Id.* at 39–40. If Defendants instead removed the fraudulent registrations, the Applicants say, multiple lotteries would be unnecessary because USCIS would not have needed to reject as many registrations. *Id.* at 40.

As before, the Applicants are dressing up old arguments.  An agency need not address every argument provided it explains why it acted as it did.  *Pub. Citizen*, 988 F.2d at 197.  More, the Applicants' position boils down to a requirement that agencies regulate exhaustively if they regulate at all.  But "an agency need not solve every problem before it in the same proceeding. This applies even where the initial solution to one problem has adverse consequences for another area that the agency was addressing."  *Mobil Oil Expl. & Prod'ing Se. Inc. v. United Distro. Cos.*, 498 U.S. 211, 231 (1991); *see also United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) (holding that an agency need not "progress on every front before it can make progress on any front").  "Agencies often must contend with matters of degree.  Regulations . . . are not arbitrary just because they fail to regulate everything that could be thought to pose any sort of problem."  *Pers. Watercraft Indus. Ass'n v. Dep't of Comm.*, 48 F.3d 540, 544 (D.C. Cir. 1995).

The Department's goal in implementing this regulation was to reduce the burden of the H-1B process on USCIS and petitioners.  *See* Defs.' Mem. at 20–22; *see also* 84 Fed. Reg. at 900 ("DHS also declines to adopt the suggestions to collect additional information regarding the petitioner, beneficiary, or . . . position . . . .  The selection process is intended to impose little burden, as it is a random process that does not assess eligibility.").  As explained above, the Department did consider the possibility that the Registration Rule would increase fraud.  But the Department is not required to solve the issue of fraud with the Rule.  *See Mobil Oil Expl. & Prod'ing Se. Inc.*, 498 U.S. at 214.

The Applicants argue that USCIS "is only now realizing that the current fraud prevention and detection measures in place are insufficient" and announced "a new attestation for employers to sign as part of the FY2023 registration process."  Pls.' Reply at 18; *see also* Pls.' Not. of Supp. Info. at 2 (arguing that "it appears that USCIS recognizes that a problem exists and is trying to

'fix' the problem created by its improper regulatory drafting").  But this is just the type of incremental improvement one would expect to see from an agency.  Agencies should neither be hobbled by a requirement they regulate comprehensively off-the-bat, nor penalized when they correct initial mistakes—provided, of course, that they meet their burden to explain why they are regulating a certain way.  The Department met that burden here.

## V.

For these reasons, the Court will deny Plaintiffs' motion for summary judgment, will grant the Alliance's cross-motion for summary judgment, and will grant Defendants' cross-motion for summary judgment except as to standing.  A separate Order will issue.


Dated: March 1, 2022                                  _____
                                                      TREVOR N. McFADDEN, U.S.D.J.